1:22-mj-3155-TMP

## AFFIDAVIT

I, Matthew E. Scalisi, being first duly sworn, depose and state under oath as follows:

## INTRODUCTION

1. Affiant submits this affidavit in support of a criminal complaint charging CASEY ALEXANDER (Alexander) and other unknown co-conspirators (together, "Defendants") with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (the "Target Offense"), in or around November 2021, to on or about June 14, 2022, in the Northern District of Ohio, Eastern Division, and elsewhere.

2. Defendants have participated in a scheme to obtain by fraud and interstate wires investments, primarily from elderly victims across the United States of America, more than $13 million through a purported wine or whiskey investment fraud scheme, which originated in the United Kingdom and resulted in funds disbursed into bank accounts controlled by Charles Winn LLC; VWC LLC; and Windsor Jones LLC (together, the "Suspect Companies"). To obtain investments from elderly victims, Defendants obtained the phone numbers of victims and cold-called them. Using aggressive and deceptive tactics promising large returns on wine and whiskey investments, Defendants were able to convince victims to wire funds or make checks out to the Suspect Companies to invest in purported wine or whiskey. After the initial investment with the Suspect Companies, the Defendants kept in contact with the victims via email and telecommunications convincing them to keep investing with the Suspect Companies by promising even larger returns on their initial investments. To date, no victim within the United States has received a return on their investment as promised by the Defendants. Elderly victims that were interviewed by the Agents, and other law enforcement agencies, reported they never heard of the Suspect Companies prior to being contacted by them. The victims reported to be

involved with multiple investments, but they did not know how the Suspect Companies acquired their name and contact information.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since July 7, 2019. As a Special Agent with the FBI, I am assigned to the Complex Financial Crimes Squad. I have obtained extensive training and experience within the FBI on investigating financial crimes leading to federal prosecutions. Prior to becoming a Special Agent with the FBI, I was a Special Agent with the United States Secret Service ("USSS") from July of 2016 to July of 2019. While working out of the Chicago Field Office within the USSS, I was assigned to the Financial Crimes Unit. I have worked on multiple financial crimes cases that involved wire fraud, bank fraud, aggravated identity theft, and other frauds and swindles. I have been assigned to work with the U.S. Department of Justice and other law enforcement partners to investigate possible elder fraud in response to the Elder Justice Initiative Program originating from The Elder Abuse Prevention and Prosecution Act of 2017 (EAPPA). The mission of the EAPPA and Elder Justice Initiative is to support and coordinate the Department of Justice's enforcement and programmatic efforts to combat elder abuse, neglect, financial fraud, and scams that targets the nation's elderly population.

4. As an investigative or law enforcement officer of the United States within the meaning of Section 2501(7) of Title 18, United States Code, I am empowered by law to conduct investigations of, and to make arrests, for offenses enumerated in Section 2516 of Title 18, United States Code.

5. This affidavit is based on my personal investigation, and through the investigation by others including law enforcement partners whom I know to be reliable and trustworthy, as well as my training and experience. The facts contained herein have been obtained by

interviewing witnesses and examining documents obtained in the course of the investigation as well as through other means. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

**FACTS AND CIRCUMSTANCES REGARDING PROBABLE CAUSE**

*The Suspect Companies*

6.      Charles Winn LLC (Winn) is a limited liability company that was registered in Delaware on or around August 2017. Winn used business addresses of 300 Delaware Avenue, Suite 210, Wilmington, Delaware 19801 (a virtual office) and 3524 Silverside Road, Suite 35B, Wilmington, Delaware 19810 (the office of its registered agent). Winn is reportedly headquartered in the United Kingdom. Winn's reported email address is admin@charles-winn.com, and Winn used multiple contact numbers with a 302 Delaware area code.

7.      Windsor Jones LLC (Jones) is a limited liability company that was registered in Delaware on or around August 2017. Jones used business address 3524 Silverside Road, Suite 35B, Wilmington, Delaware 19810 (a virtual office), and the same virtual office associated with Winn. Jones is reportedly headquartered in the United Kingdom. The reported email address for Jones is admin@windsorjonesllc.com, and Jones used multiple contact numbers with a 302 Delaware area code.

8.      Vintage Whisky Casks (VWC) is a limited liability company that used a business address of 8 The Green, Suite 7820, Dover, Delaware 19901 and 211 East 43rd Street 7th Floor, New York, New York 10017. VWC is reportedly headquartered in the United Kingdom. The reported email address for VWC is admin@vintagewhiskycasks.com, and VWC used multiple contact numbers with a 302 Delaware area code.

3

9. The Suspect Companies and Defendants have engaged in a cold-calling scheme to target investors throughout the United States to invest in their purported wine and whiskey brokerage programs. The Suspect Companies claimed they could identify and purchase a portfolio of fine wines and or whiskeys on behalf of investors, which would be held in a bonded warehouse within the United Kingdom until sold for a profit. The Suspect Companies used multiple Delaware contact numbers to cold-call victims. Victims reported being contacted by Defendants using the same name, for example "Elliot Stewart," even though Defendants were representing different Suspect Companies. Victims reported that the Defendants representing the Suspect Companies spoke with a "British" accent and told the victims that the Suspect Companies had offices located in the Delaware area. Defendants told multiple victims that the Suspect Companies had physical locations victims could go to if the victims desired to meet with a representative from the Suspect Companies.

10. To date, no victims identified reported having an in-person meeting with a Defendant representing Winn or Jones. In or around November 2021, victims started to report in-person meetings with a Defendant associated with VWC.

***The Scheme***

11. On 04/14/2020, Highland Heights Police Department (HHPD) in Highland Heights, Ohio, located in the Northern District of Ohio, contacted the Agent to report an international investment fraud scheme.

12. Victim 1 was 89 years old and resided in Highland Heights, Ohio at the time of contact. Victim 1 had designated his son as Power of Attorney (POA) for Victim 1. POA called HHPD to report that Victim 1 was a victim of a cold-call scam in which Victim 1 was defrauded out of over $300,000 over an 18-month period from Winn. Victim 1 had copies of emails and

4

bank transactions between Winn and Victim 1.

13. Victim 1 believed Victim 1 was investing in a wine broker service located in London, England. The Defendants who called and spoke with Victim 1 convinced Victim 1 to invest in purported "rare dessert wines" that would increase in value over time.

14. HHPD discovered complaints in December 2019 from individuals across the United States who reported being victims of a "wine scam". Victims reported they were "cold-called" by either a "Robert Wilson" or "Sebastian Renner" who claimed to be representatives of Winn. These victims, like Victim 1, were asked to purchase wine as an investment. Victim 1, as well as the other callers, confirmed that Defendants had "British" accents.

15. The Defendants who contacted Victim 1 directed Victim 1 to create a log-in account with "EHD London No 1 Bond Ltd" (EHD). EHD had an address of Unit E Dolphin Estate Windmill Road, Sunbury-On-Thames, TW16 7HE (United Kingdom). EHD's phone number was 01932 334300. Victim 1 received an email from daisy.gleeson@ehdlondon.com with instructions to set up a Winn investment account.

16. On 12/19/2019, Victim 1 received an email from "Michael Phelps" (Phelps) who claimed to be the Director for EHD. Phelps claimed Victim 1's account application was processed for wine storage services. Victim 1 could now log on the account for "stock inquiries."

17. Victim 1's POA reviewed the phone records for Victim 1 and discovered nearly 250 phone calls from the Delaware area code from Winn to Victim 1 in Ohio. The Defendants who primarily called Victim 1 were "David" and "Joseph Adams" from Winn.

18. The last instructions given to Victim 1 was to send funds to Winn to pay for a purported storage locker in France for the wine purchases. Victim 1 primarily mailed checks to Winn and sent wire transfers when directed to by Defendants from Huntington Bank, JP Morgan

5

Chase, and KeyBank, in Ohio to Bank of New York in Delaware.

19. Affiant reviewed financial records that showed Victim 1 invested $169,520 between 12/24/2018 and 3/23/2020 (9 transactions) in what Victim 1 believed to be "rare dessert wines." Victim 1 never received any of his investment back. Prior to law enforcement getting involved, Winn kept pressuring Victim 1 to invest more money with the promise of making large returns on the investment.

20. On or about 08/14/2020, Stewart called Victim 2 from a Delaware area code. Victim 2 was 73 years old and lived in Grandville, Michigan.  After speaking with Stewart, on 08/19/2020, Victim 2 wired $25,560 to Winn's Bank of America account ending in 3081 under the belief it was for an investment of rare European wines. On 01/19/2021, Victim 2 wired Winn $60,000 to Winn's Bank of America account ending in 3081 with the intent to purchase more wines.

21. Before investing with Winn, Stewart promised Victim 2 a potential return of 35% to 40% on Victim 2's investment. Winn claimed to have "Chinese" buyers who were willing to pay for the rare wines.  Victim 2 decided to invest with Winn because of how convincing Stewart was. Stewart claimed it was a great investment opportunity because Winn tapped into the "Chinese market," and not many people knew how valuable wine investments were.

22. Victim 2 believed Winn was located in Philadelphia, Pennsylvania. After months of not hearing anything about the investments, Victim 2 called and emailed Winn multiple times but neither Stewart, nor any other Defendants, ever called or emailed Victim 2 back.

23. At one point, Victim 2 finally received a call from a Defendant representing

6

Winn. The Defendant claimed Victim 2 could not receive a return on investment because Winn was going through a "restructuring."

24. On 12/13/2021, Victim 3 advised that in or around December 2020, Victim 3 received a call from a Defendant, later identified as Alexander, a United Kingdom National, from the United Kingdom, asking if Victim 3 was interested in a whiskey investment opportunity through VWC. Victim 3 advised that Alexander sent videos and brochures about VWC via email. Victim 3 stated that Alexander explained that the distillers liked to have their new casks sold for cash flow reasons. Alexander said that if Victim 3 purchased casks from VWC, the casks would double in value in three years. Victim 3 was advised by VWC that an investor would have to hold onto the casks for a minimum of 3 years before the investor's investment could be sold.

25. Alexander then passed Victim 3 off to a colleague "Elliot Stewart" from England. Victim 3 stated that all the telephone calls Victim 3 received from Alexander and Stewart were from Delaware area codes. Alexander claimed VWC had an office in Wilmington, Delaware. Victim 3 advised that Victim 3 continued to receive telephone calls from Alexander. Victim 3 advised that in late Spring, or early Summer 2021, Victim 3 purchased approximately $22,000 of whiskey from VWC and mailed a check to the VWC address in New York that Stewart provided Victim 3. Victim 3 stated that after the first purchase, Alexander said that Alexander was coming to the United States and was going to visit Victim 3.

26. Victim 3 met with Alexander in or around November 2021 in Phoenix, Arizona. Alexander visited Victim 3 at Victim 3's work office. Victim 3 advised that Alexander took a cab from the airport, and they talked for about an hour about the whiskey. Alexander said that if Victim 3 invested more into VWC, then Victim 3 would receive an invitation from VWC to a party for high-end investors in Scotland. Victim 3 stated that after the meeting, Alexander had

Victim 3 pay for Alexander's Uber ride back to the airport. Alexander claimed that Alexander was meeting other "investors" in the United States and needed to get back to the airport.

27. Victim 3 advised that after the meeting, Stewart called and wanted Victim 3 to invest by purchasing $250,000 of Hogshead whiskey. Victim 3 advised that Stewart was pushy and kept saying that he was able to obtain a special deal for Victim 3. Stewart claimed the whiskey would be stored in a purported VWC warehouse in London. Victim 3 told Stewart that Victim 3 would not invest more than "$100,000." Stewart wanted the check addressed to VWC and provided the New York address (another virtual turn-key office associated with Winn). Victim 3 mailed a check for $100,000 to VWC. After being contacted by Agents, Victim 3 was able to contact Victim 3's bank and prevent the check from being cashed by VWC by requesting stop payment.

28. In or around May 2020, Affiant was able to develop a cooperating witness (Witness 1) at the virtual offices associated with Winn and VWC. Before being contacted by Affiant, Witness 1 was told by Defendants that if a check came to the office, Witness 1 was instructed to go to the Bank of America branch location next to the virtual office and deposit the checks into the Winn account. Witness 1 reported receiving multiple "cease and desist" letters from various state securities agencies, like the Texas State Securities Board, and from attorneys who represented victims across the United States. Witness 1 would open the mail and then scan it to Winn. Winn never responded to the complaints. Witness 1 confirmed that no one from Winn or VWC ever came to the office location.

29. Witness 1 advised Affiant when checks from victims had arrived at the Delaware and New York offices associated with Winn, Jones, and VWC. Agents contacted the victims to interview them. After speaking to the Agents, multiple victims cancelled their investments with

8

Winn and VWC. Victims reported to have already sent thousands of dollars to the Suspect Companies. Agents prevented $466,200 in checks from victims from being deposited into the accounts of the Suspected Companies by having Witness 1 send the checks to the Agents and by advising victims. In response, Winn and VWC started to advise new investors that Winn and VWC no longer accepted checks and now only accepted wire transfers. Witness 1 also reported that Winn attempted to pay for Winn's rent with a credit card associated with VWC.

30. After Victim 3 requested a stop payment on Victim's $100,000 check, Alexander visited Victim 3 on 03/07/2022. Alexander pitched VWC again to Victim 3. Prior to Alexander's departure, Victim 3 spoke about a "friend" (Witness 2)[1] in the Northern Ohio area interested with investing into VWC. Alexander told Victim 3 to have Witness 2 contact VWC.

31. From 03/28/2022 to present, Witness 2, located in Cuyahoga County, Ohio, in the Northern District of Ohio, has been in contact via telephone, text message, and email that traveled in interstate commerce with a VWC representative named "Chris Bell" (Bell). Bell used the VWC email address admin@vintagewhiskycasks.com with Witness 2. Bell used the phone number (302) 772-4434, with the (302) Delaware area code, with Witness 2. Through telephone calls, Bell solicited Witness 2 to purchase purported whiskey. Witness 2 purchased $7,000 of Blue Hill (Craigellachie). Witness 2 received a VWC Certificate of Ownership that stated that Witness 2 purchased a barrel of a vintage 2017 Craigellachie. The VWC Certificate of Ownership is similar to the Certificate of Ownerships that Winn and Jones victims received. Witness 2 inquired with Bell multiple times as to the physical location of where the whiskey was

---

[1] Witness 2 was previously charged and convicted of securities fraud and agreed to cooperate with law enforcement in hopes of reducing Witness 2's sentence pursuant to U.S.S.G. § 5K1.1. After serving Witness 2 sentence, Witness 2 continued to cooperate with law enforcement. Affiant corroborated the information provided by Witness 2 through independent investigation.

stored. Bell was unable to give Witness 2 the address of the physical location of where the whiskey was stored.

32. Bell put Witness 2 in contact with Stewart. Both Bell and Stewart used phone numbers with Delaware area codes. Stewart advised Witness 2 that he was traveling to Northern Ohio on or around May 19, 2022. Stewart wanted to have a meeting with Witness 2 to secure a large-scale investment from Witness 2.

33. During a phone call between Witness 2 and Bell, Bell told Witness 2 that VWC employees would only get paid 10% of the profit after the whiskey matured and was sold to third parties. Based on financial analyses performed, investor contributions constituted the majority of funds deposited into VWC bank accounts between October 2021 and March 2022. During the same period, Alexander, received approximately $44,953.

34. On 05/18/2022, at approximately 1:33 PM, Witness 2 contacted Affiant and informed Affiant that Stewart had arrived via plane at Cleveland Hopkins International Airport.

35. On 05/18/2022, at approximately 8:00 PM, Witness 2 met with Witness 3 in Cleveland, Ohio. Witness 3 advised that he was sent on Stewart's behalf. Witness 3 claimed to be the VWC representative for the United States.

36. On 05/19/2022, at approximately 10:00 AM, Witness 3 was arrested by FBI Cleveland.

37. Witness 3 advised the FBI that Witness 3 first learned of Vintage Whisky Casks, LLC (VWC) after being recruited for a job on LinkedIn. Before accepting a job with VWC, Witness 3 had an interview via Zoom with Target 1. Witness 3 positively identified Target 1 in a photograph. Target 1 wanted to open operations up in the United States and told Witness 3 that Witness 3 would run the operations within the United States. VWC offered Witness 3 $40,000 a

year for a salary, and Witness 3 was to be paid monthly. Stewart told Witness 3 VWC would eventually start paying medical insurance, but they never did. Witness 3 struggled financially and Witness 3's wife was also experiencing health issues at the time Witness 3 took the job with VWC. Witness 3 had only been working with VWC for approximately a few months prior to being arrested. Witness 3 never did any research on VWC prior to accepting the job. Witness 3 believed VWC had a physical address in Delaware.

38. VWC set up appointments for Witness 3 to visit current investors. Witness 3's job was to "wine and dine" investors in an attempt to convince individuals to invest larger amounts into VWC. Every individual Witness 3 visited with previously invested into VWC. Witness 3 would show the investors paperwork provided by VWC on the potential benefits one could receive if they made a larger investment. Witness 3 would claim it was a smart investment, and that an investor could expect a 30% to 40% return on their investment. The investment was back-end loaded meaning VWC would take 10% at the end of the investment. VWC would not make a profit until the investor made a profit or sold off their investment.

39. Witness 3 admitted to making around a 2% commission on the dollar amount of each sale completed. Witness 3 claimed to have met around eight or nine different investors within the United States since working for VWC. Stewart contacted Witness 3 on who to meet and where to meet them at. VWC paid for the flights and hotel stay for Witness 3. VWC also provided Witness 3 funds to use while on trips. Trips were made last minute, and Witness 3 just traveled where Stewart told him to go. The goal was to deceive potential investors by having Witness 3 look and sound like an experienced VWC associate in an attempt to convince them to invest more funds.

40. Most of the individuals Witness 3 met with were elderly individuals. Witness 3

felt like VWC marked up their prices on the whiskey. Witness 3 did not believe securities were being sold because Witness 3 was under the impression investors were purchasing a private asset, Witness 3 admitted to receiving commission payments from VWC even though investors are led to believe VWC did not make a profit until the investor sold off the investment.

41. On June 2, 2022, Stewart texted Witness 2 that Stewart would be sending a whisky analyst to Cleveland to meet with Witness 2 about investing in whisky. Witness 2 texted Stewart, and they scheduled the meeting for June 13-14, 2022.

42. On June 13, 2022, Stewart texted Witness 2 that Alexander arrived in Cleveland to meet with Witness 2. Alexander met with Witness 2 and they exchanged phone numbers. Alexander solicited Witness 2 to invest in whiskey. Alexander told Witness 2 that VWC employees would only get paid 10% of the profit after the whiskey matured and was sold to third parties.

43. Affiant reviewed bank records that showed that Alexander was the signatory on the US Bank accounts for VWC. Affiant reviewed the UK business listing for a company called VWC USA Ltd. that showed Alexander was listed as officer of the company. FBI Forensic Accountants reviewed bank records and from 10/27/2021 to 04/08/2022, VWC USA Ltd received 22 transactions in the amount of $420,657.91 in its UK account, with all funds having been traced to United States investor money and Alexander receiving $33,052.45 from the VWC account.

44. To date, the FBI has been able to identify over 150 victims within the United States by performing a financial analysis of the Suspect Companies bank account records obtained. To date, the Suspect Companies have returned approximately $250,000 of the $13 million invested by the victims in the purported wine and whiskey fraud scheme.

## CONCLUSION

45.    Based on the information provided in this affidavit, I respectfully submit that there is probable cause to believe that Casey Alexander and other unknown co-conspirators committed the Target Offense, and to issue the requested arrest warrant.

_____
Matthew E. Scalisi
Special Agent, FBI

Sworn to via telephone after submission by reliable electronic means. Crim.Rules. 4.1; 41(d)(3)



_____
Thomas M. Parker
United States Magistrate Judge
**2:08 PM, Jun 14, 2022**